```
 1                   IN THE UNITED STATES DISTRICT COURT
                    FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                            EASTERN DIVISION

 3

 4    UNITED STATES OF AMERICA,          )    No. 20 CR 35-1
                                         )
 5              vs.                       )    Chicago, Illinois
                                         )
 6    WILMER ALEXANDER GARCIA MEZA,       )
                                         )    February 6, 2020
 7                   Defendant.           )    11:19 a.m.

 8                        TRANSCRIPT OF PROCEEDINGS
 9       BEFORE THE HON. GABRIEL A. FUENTES, MAGISTRATE JUDGE

10
      APPEARANCES:
11
      For the Government:    MR. MICHAEL C. LANDMAN
12                           MR. THOMAS W. FLYNN
                             United States Department of Justice,
13                           Tax Division,
                             610 D Street,
14                           Washington, DC   20579

15
      For the Defendant:     MR. STEVEN A. GREENBERG
16                           Steven A. Greenberg & Associates, Ltd.,
                             53 West Jackson Boulevard, Suite 1260,
17                           Chicago, Illinois   60604

18

19

20

21

22

23                           PATRICK J. MULLEN
                           Official Court Reporter
24                     United States District Court
                   219 South Dearborn Street, Room 1412
25                       Chicago, Illinois   60604
                             (312) 435-5565
```

1           THE CLERK:  20 CR 35, United States versus Wilmer
2    Alexander Garcia Meza, status and detention.
3           THE COURT:  Okay.  So we're here for a status report.
4    Which one of you -- well, first of all, introduce yourselves
5    for the record, and then we'll get started.
6           MR. LANDMAN:  Good morning, Your Honor.  Michael
7    Landman on behalf of the United States.
8           MR. FLYNN:  Tom Flynn, Judge, good afternoon -- or
9    good morning.
10          MR. GREENBERG:  Good morning, Your Honor.  Steve
11   Greenberg on behalf of Mr. Garcia Meza who's present, as is his
12   wife Daisy Cortes.
13          THE COURT:  Okay.  As I understand it, the ball is a
14   little bit in Mr. Garcia Meza's court as to the possible
15   posting of property.  We were exploring what could be posted,
16   what equity might be available and, if so, how much was
17   proposed to be posted.  This is a condition that is beyond what
18   pretrial services had recommended, but it was a condition to
19   which I was leaning.  So, Mr. Greenberg, where are we?
20          MR. GREENBERG:  Your Honor, we did provide essentially
21   a market analysis -- we've ordered a certified appraisal, but
22   that takes longer -- which we provided to Ms. Bissell.  She was
23   fine with that.  I think the Government is fine with that.
24   There was an issue of unpaid property taxes which were paid
25   yesterday in full, so that's no longer an issue.  I showed a

1    receipt this morning, and we're going to ask that the property

2    be posted.

3         I understand that Ms. Bissell is ill today, and so the

4    email with the property taxes didn't get to her yesterday

5    because she left early.  So the paperwork is not 100 percent

6    done, but they said they can get it done today.  Everybody is

7    here, and we would ask that he be released and then perhaps

8    within 14 days we provide a certified appraisal.  If there's an

9    issue then, then we'll come back.

10        THE COURT:  I'm a little skeptical of releasing before

11   all the paperwork is done but, Mr. Landman, where are you?

12   Where is the Government?

13        MR. LANDMAN:  So the Government's position stands that

14   we would oppose a secured bond, and just briefly I would just

15   like to highlight a few things that have come to the

16   Government's attention since the last hearing.

17        THE COURT:  Okay.

18        MR. LANDMAN:  As to Ms. Cortes, an analysis of

19   Ms. Cortes' bank accounts during the period of the scheme shows

20   that there are significant unexplained deposits into those

21   accounts.  In 2014, there was 35,000 or approximately $35,000

22   in cash and other --

23        THE COURT:  I'm sorry.  Which year?

24        MR. LANDMAN:  2014.

25        THE COURT:  Okay.

1          MR. LANDMAN:  There was $35,000 in cash and other

2    unidentified deposits.  When we obtain records from the bank,

3    we seek checks.  So typically if someone uses a check it will

4    be scanned and we will have those.  We didn't include the check

5    deposits.  The $35,000 is just cash and other unidentified

6    deposits, which I'm told more often than not is cash.  In 2015,

7    there's 12,000.  In 2016, there's 27,000.

8          In 2014, the Government's information is that

9    Ms. Cortes did not work.  In 2015 and 2016, Ms. Cortes did

10   work, but the revenue agent was able to identify the funds that

11   she received, the reportable income that she received from her

12   employer, a security company, and these figures do not include

13   those amounts.

14         THE COURT:  You mean it was less.

15         MR. LANDMAN:  It was less, but also the revenue agent

16   was able to see when that company was paying her and didn't

17   include it.  So, for example, the 27,000 in 2016 does not

18   include her paychecks which were either direct deposited or

19   paid via check.

20         THE COURT:  I see.  So you tried to -- the revenue

21   agent tried to match up the pay dates from the job to these

22   deposits that have been identified, and they didn't match.

23         MR. LANDMAN:  Correct.

24         THE COURT:  They didn't go with each other.

25         MR. LANDMAN:  And I think even more than that, the

1  revenue agent could see a payment from her employer, so it was
2  that she saw when the security company was paying and she did
3  not include those amounts.

4       THE COURT:  Okay.  What else did you want to add
5  that's new?

6       MR. LANDMAN:  Ms. Cortes in 2016 purchased W-2
7  software, software used to prepare W-2s.  As an employee of a
8  security company, she would have no reason for purchasing that,
9  and it is notable that that software is able to be used to
10 prepare false W-2s.  In that year, false W-2s --

11      THE COURT:  So let's back up a second so that we all
12 understand because I think I do and I want to make sure I do.

13      MR. LANDMAN:  Sure.

14      THE COURT:  An employer will commonly issue a W-2 to
15 an employee to reflect the wages paid to that employee during
16 the year, the amount of taxes withheld, and the employee needs
17 that document in order to make a tax return at the end of the
18 year.  You're saying that this software is software that's used
19 to create a W-2 form and print it out?

20      MR. LANDMAN:  Correct.

21      THE COURT:  And you're saying that given the nature of
22 her employment it wasn't like she was running a business where
23 she had to issue W-2s or maybe was doing it this for the
24 security company, the security company employees.  You're
25 saying there's no explanation that jibes -- and Mr. Greenberg

1  will have a chance to respond in a minute -- to why she should

2  have to be generating W-2s?  Is that what you're saying?

3          MR. LANDMAN:  Yes, that's correct.

4          THE COURT:  Okay.  Okay.  So we were on 2016.

5          Oh, does the software have other uses besides

6  generating W-2s, do you know?

7          MR. LANDMAN:  I am not -- I am not aware.  The

8  individual who the special agent spoke with at the store who

9  sells that software says that it's used by employers to prepare

10  W-2s.

11          THE COURT:  Okay.  If there are other uses, you don't

12  know about them.

13          MR. LANDMAN:  Correct, correct.

14          THE COURT:  Okay.  So go ahead.  We just talked about

15  the 2016 acquisition of this W-2 software.

16          MR. LANDMAN:  Yes.  Then in -- I'm sorry.  I misspoke.

17  It was 2017 that she --

18          THE COURT:  2017 as to the software.

19          MR. LANDMAN:  Yeah, in January of 2017.

20          THE COURT:  Okay.

21          MR. LANDMAN:  So that is software that was purchased

22  around the time that people are preparing their 2016 returns.

23          THE COURT:  Okay.  So I guess I should ask you whether

24  you have any information you can proffer that reflects how that

25  software was used or by whom or what knowledge Ms. Cortes had

1  about its being used for some purpose that could include, say,

2  the offense here, preparing false returns to generate refund

3  claims.

4          MR. LANDMAN:  Fraudulent tax returns.

5          THE COURT:  I mean, do you have anything else to tell

6  us about her knowledge and involvement other than the inference

7  we might draw from her having purchased it?

8          MR. LANDMAN:  Correct.  With respect to that software,

9  no.  However, there are two other facts that provide an

10  inference that Ms. Cortes may have been aware.

11          THE COURT:  Okay.  Before you get to those other

12  facts, her acquisition of the software, how do you know it was

13  she who acquired it?  Did you establish some evidence of that?

14  Did a clerk identify her?  Did she use a card or a check?  What

15  can you tell me?

16          MR. LANDMAN:  I can tell you that it was paid for

17  using her bank account.  So we don't have an eyewitness who

18  says that she purchased it.  So, yes, the possibility that

19  someone else used a debit card in her name to purchase the

20  software --

21          THE COURT:  Okay.

22          MR. LANDMAN:  -- we can't dispute that.

23          THE COURT:  Okay.  But understand that's very

24  different from -- you know, that she acquired the software and

25  bought it is very different from her account was used to

1     purchase it in my view.

2              MR. LANDMAN:  Yes.

3              THE COURT:  I'm just saying.

4              MR. LANDMAN:  Yes.

5              THE COURT:  Okay.

6              MR. LANDMAN:  And I'm sorry if the Government gave you

7     a misimpression.

8              THE COURT:  Okay.  Let's just be careful because I

9     always like to be sure we're understanding facts right to the

10    extent we know them.

11             MR. LANDMAN:  Yeah.

12             THE COURT:  So what are these two other facts you want

13    to tell me?

14             MR. LANDMAN:  There's a post office box that used to

15    send fraudulent refund checks in North Chicago, and Ms. Cortes

16    was listed as a secondary user of that account, Mr. Garcia

17    being the primary user.

18             THE COURT:  Okay.

19             MR. LANDMAN:  Then the last fact is that in February

20    of 2016 there was a Treasury check that the Government has

21    information was fraudulently obtained, cashed at a grocery

22    store in the North Chicago-Waukegan area for approximately

23    $4200, and that same day Ms. Cortes deposited $3200 into her

24    bank account, and I should say cash or other unidentified

25    deposit.

1   THE COURT:  Okay.  So the check, you say, was 4200?

2   MR. LANDMAN:  4251.

3   THE COURT:  The deposit was 3200.

4   MR. LANDMAN:  Yes, 3240.

5   THE COURT:  And how do you know it was Ms. Cortes who

6   deposited it into her account?  Sometimes people do deposit

7   money into other accounts and the tellers allow it.  What do

8   you know about that?

9   MR. LANDMAN:  Correct.  The money was deposited into

10  Ms. Cortes' account.  That's the extent of the Government's

11  information.

12  THE COURT:  Okay.  Do we have reason to believe that

13  bank statements for the account in 2014, '15, and '16, were

14  being transmitted to Ms. Cortes or to an address where she

15  would have received them or had some ability to look at them

16  either electronically or by mail?  Do we have reason to think

17  that that was occurring?

18  MR. LANDMAN:  Yes.  There were bank statements, and

19  they have, I believe, the address.

20  MR. GREENBERG:  Judge, they were.

21  MR. LANDMAN:  Yeah.

22  THE COURT:  Okay.  So we have no reason to think that

23  she doesn't know that these five-figure amounts are being

24  deposited into her account that are separate from the money she

25  is being paid by the security company.

1          MR. GREENBERG:  Correct.

2          THE COURT:  Okay.  What else do you want to tell me?

3          MR. LANDMAN:  With respect to Ms. Cortes, that is all,

4    yes.

5          THE COURT:  Okay.  Have you been -- other than today,

6    have you been able to share this information or discuss it with

7    pretrial services?

8          MR. LANDMAN:  No, we haven't.

9          THE COURT:  Okay.  Pretrial services, please come and

10   be heard.  I do want you to sit down when you can sit down, but

11   at the moment, if you can tell me, this is all news to you,

12   right?

13         MS. CHAPMAN:  That's correct.

14         THE COURT:  And you're Ms. Chapman, right?

15         MS. CHAPMAN:  That's correct.

16         THE COURT:  Okay.  So you have not had a chance to

17   really consider this information in the broader context of

18   pretrial services' recommendations, isn't that right?

19         MS. CHAPMAN:  That's right, although my understanding

20   would be that it wouldn't affect our recommendations as it's

21   very focused on the nature and circumstances of the case and we

22   take more into consideration the background of the defendant.

23         THE COURT:  Okay.  Let me ask you another question and

24   tell me if I'm remembering this wrong.  As I am remembering,

25   wasn't Ms. Cortes the young person who now works for the TSA?

1    MR. LANDMAN:  Correct.

2    THE COURT:  Okay.  So Ms. Cortes was being offered as

3    a third-party custodian.  The Court was inclined, in addition

4    to pretrial services' recommendations, to require the

5    custodianship, and didn't pretrial services conduct an

6    interview of Ms. Cortes?

7    MS. CHAPMAN:  We did.

8    THE COURT:  And at that time, pretrial services did

9    not raise any objection or issue with her appropriateness as a

10   third-party custodian.  Am I right about that?

11   MS. CHAPMAN:  That's right.

12   THE COURT:  Has that determination been considered or

13   reconsidered in light of the information we're hearing today?

14   MS. CHAPMAN:  I would say no, but we initially weren't

15   recommending a third-party custodian in the first place.

16   THE COURT:  Right, but I want to require it.

17   MS. CHAPMAN:  Sure.

18   THE COURT:  And I need to be comfortable with the

19   arrangement.

20   MS. CHAPMAN:  Sure.

21   THE COURT:  So let's do this.  Mr. Greenberg has some

22   things he wants to say about all this.  If pretrial services

23   considers anything that the Government proffered, it should

24   also consider what Mr. Greenberg has to add.  So why don't we

25   hold off.

1    Did you have anything else from the Government, sir,

2  on all this?

3    MR. LANDMAN:  No, Your Honor.

4    THE COURT:  Okay.  Then let's have Mr. Greenberg be

5  heard on this, and then we can move on from there.

6    MR. GREENBERG:  Judge, very simply, there is no

7  dispute that Mr. Garcia Meza may have -- I'm not conceding that

8  he may have bought anything, but he's here as the Court knows

9  undocumented.  He doesn't have credit cards.  He doesn't have

10 his own bank account.

11    He was working during that period of time at jobs

12 which paid primarily cash, and he would make -- give money to

13 Ms. Cortes to deposit during that time if he wanted to buy

14 something.  I think this software purchase was an online

15 purchase.  He would have used her information to make his

16 online purchase, similar to what my kids do still to this day,

17 unfortunately.

18    As far as the Bank of America accounts, I did get

19 yesterday a summary from the Government, and I read it a little

20 bit differently.  It's their summary, so I'm guessing I'm sort

21 of limited because they have much more knowledge.  But it says,

22 for instance, for 2014 ATM deposits where there's no copies of

23 checks provided by the bank and no paper deposit slip.

24    Well, if you go to an ATM, at least in my experience

25 at Chase, you don't get a deposit slip.  You don't fill out a

1 deposit slip.  You simply put in your card, you punch in your
2 numbers, and a little drawer opens up and you slide in the
3 checks.  Now, I can print out a receipt afterwards, but I don't
4 get a deposit slip for those transactions.  So I don't see that
5 as an especially suspicious thing.  Then the others are counter
6 credits where there are deposit slips identifying cash
7 deposits.
8        So I believe this is the sum total of all of the
9 deposits that were made, but again I haven't had a chance to
10 analyze the information.  In 2014, there's 35,000, 12,000 the
11 next year, and then 27,000.
12        THE COURT:  Refresh my memory.  How does that match up
13 with the reported income to pretrial services from the work he
14 was doing where he reported it?
15        MR. GREENBERG:  I don't have information on his
16 reported income --
17        THE COURT:  Okay.
18        MR. GREENBERG:  -- at this point.
19        THE COURT:  It's in the report which I need to
20 generate.
21        MR. GREENBERG:  You mean what he told pretrial, Your
22 Honor?
23        THE COURT:  Yes.
24        MR. GREENBERG:  Well, he's now got a job through an
25 agency where he actually, I believe, gets a paycheck.  Correct?

1     THE COURT:  Okay.  How about 2014, '15, and '16, when
2  the five-figure deposits are being made that are not really
3  from Ms. Cortes' work as you're stating?

4     MR. GREENBERG:  You know, he lists that he makes
5  $4,000 a month now.  So if he would have made, you know,
6  three-quarters of that, it would match up with the amounts
7  we're talking about.  I don't honestly know the amounts, and I
8  haven't had a chance to do that analysis.  I can tell you that,
9  for instance, for the year 2014 the total amount of the
10  indicted conduct is about $16,000.

11     THE COURT:  Okay.

12     MR. GREENBERG:  So it's significantly less than the
13  amount of the deposits.

14     THE COURT:  Let me just stop you and tell you kind of
15  what I'm thinking.  Okay?  I kind of came into this process
16  with a great deal of comfort with Ms. Cortes as a third-party
17  custodian in part because she has an exceedingly legitimate
18  position.  I was unpersuaded by the idea that she somehow
19  should have known about all this or prevented it by virtue of
20  her status as a TSA agent and that, therefore, that somehow
21  made her a worse third-party custodian.  I really did reject
22  that argument.  I was persuaded by the fact that she was
23  subjected to a background check before she could take her
24  position, you know.  So all of that weighed, you know, in favor
25  of release.

1       I'm still looking at a situation where I was going

2   beyond what pretrial services even wanted to do.  I'm concerned

3   by what's been proffered.  I want to look at it a little more

4   closely, take a few minutes to do that.

5       Why don't you address, Mr. Greenberg, the other thing

6   I was trying to do here, which is to make this case a little

7   more like, for example, U.S. versus Lechuga, which was Judge

8   Gilbert's decision where he released somebody.  He had the fact

9   that he was without documentation to be in the country

10  lawfully, but he had been in the country for a very long time,

11  had kind of a stable employment and social background here, and

12  was willing to post a bond.

13      In other words, where I'm coming from is I needed a

14  lot of conditions to make me feel comfortable, and it looked

15  like we were getting there.  But, you know, how much equity are

16  you proposing putting up here?

17      MR. GREENBERG:  Your Honor, the market analysis says

18  that the house is worth just over $129,000.  Now that's from a

19  realtor, so I think realistically you could take 10 percent off

20  of that if you were to arrive at a truer figure probably.

21      THE COURT:  What do we know about mortgages, liens?

22      MR. GREENBERG:  There are no mortgages.

23      THE COURT:  Okay.

24      MR. GREENBERG:  There are no liens.  I provided a

25  title report.  It is owned free and clear, and she is willing

1  to provide it.

2         Can I just circle back to the other point for one

3  moment?

4         THE COURT:  Go ahead.

5         MR. GREENBERG:  I had a number of discussions with

6  Ms. Cortes over the last few days, including telling her:  You

7  may very well go down this road and find out that Mr. Garcia

8  Meza is still detained by INS.  You've got this position at

9  TSA.  You don't want people snooping around, and you don't want

10 people saying that.

11        She is adamant that she doesn't know anything, and

12 she's like:  You know, I'm not going to risk my job for

13 something like that if we could say no and just leave him where

14 he is and not make this -- you know, not put me in jeopardy at

15 all.  If I had the slightest inclination that I've done

16 something wrong, I would call it a day now.

17        I had that discussion again with her last night, and I

18 had that discussion with her out in the hallway this morning.

19 She is adamant that she didn't know about anything.

20        THE COURT:  Let me ask the Government this.  With

21 Ms. Bissell, unfortunately, not well today -- and I wish her a

22 speedy recovery -- I'm having a little bit of a lack of full

23 comfort with having property posted without her involvement in

24 giving the Government proper advice and information about

25 whether to agree to such a thing.

1    Assuming, assuming, I know you oppose release on a

2    secured bond, but if I were to do that, are we ready to do that

3    today in your view or do you need Ms. Bissell weighing in?

4    MR. LANDMAN:  No, we have Ms. Cuadra, and we're fully

5    confident in Ms. Cuadra.

6    THE COURT:  Okay.

7    MR. LANDMAN:  And if Your Honor's inclination is to

8    release with a secured bond, we believe that the correct

9    paperwork could be executed today --

10    THE COURT:  Okay.

11    MR. LANDMAN:  -- and the defense counsel's

12    representation of a full certified appraisal within a set time

13    frame by the Court would be acceptable if Your Honor is

14    inclined to release Mr. Garcia.

15    THE COURT:  All right.  I need a minute or two, and I

16    would like to speak with Ms. Chapman as well.  What else do you

17    want to tell me?

18    MR. LANDMAN:  The only thing that I would like to

19    point out is that during this time period Mr. Garcia did have

20    his own bank account.  It's not defense counsel's fault for not

21    being aware.  We have just provided discovery.  In that

22    discovery, you will see that Mr. Garcia did have a bank account

23    during this time frame and deposited significant sums of cash

24    and unidentified deposits.

25    THE COURT:  Into that bank account, the one that was

1    his, you say?

2         MR. LANDMAN:  No, no, it's in his name.

3         THE COURT:  Right, not Ms. Cortes' bank account.

4         MR. LANDMAN:  Exactly.

5         THE COURT:  He was depositing money into the account

6    that you say was his.

7         MR. LANDMAN:  Exactly.

8         THE COURT:  And you said it was significant amounts of

9    money.  What's significant?  Four figures?  Five figures?  What

10   are we talking about?

11        MR. LANDMAN:  Certainly five.  I have a summary.  Give

12   me one moment.

13        THE COURT:  The other question that's in the back of

14   my mind is this.  I'm not sure I heard you say or proffer that

15   the money that got put into Ms. Cortes' accounts during that

16   three-year period was ill-gotten gains.  I'm not sure you said

17   that.

18        MR. LANDMAN:  Yeah, we didn't say that because we

19   have -- because it's cash or unidentified deposits, we don't

20   have a way of specifically saying.

21        THE COURT:  Okay.

22        MR. LANDMAN:  But it is an inference that the

23   Government is drawing at this time.

24        THE COURT:  Okay.  You believe it is, but you don't

25   have anything further by way of evidence to present to us on

1   that.

2       MR. LANDMAN:  Yes.  Then the summary, I'm looking for
3   the summary.

4       (Brief pause.)

5       THE COURT:  Take your time.  It's okay.  In fact, what
6   I'm going to do is while you're doing that, to save us some
7   time I'm going to meet with Ms. Chapman.  Okay?  So we'll just
8   take a brief recess.

9       Mr. Greenberg, you have an expression on your face
10  that suggests you have more to say, and I will not cut you
11  short.  So what else do you want to say before we take this
12  recess?

13      MR. GREENBERG:  I just wanted to ask what you're
14  thinking in terms of timing because I have an 11:30 pretrial
15  conference in front of Judge Durkin and I was going to go call
16  up my associate.

17      THE COURT:  Call Judge Durkin.  I don't think we'll be
18  very long, but I just need to think about the decision you're
19  asking me to make.

20      MR. GREENBERG:  Okay.

21      THE COURT:  I want to make it in a considered way, and
22  I just need a couple minutes.  I need to talk to Ms. Chapman --

23      MR. GREENBERG:  Okay.

24      THE COURT:  -- because I have not yet decided what to
25  do here.  Okay?

1        MR. GREENBERG:  Okay.  I'm just going to go down there

2  and let him know that I'm up here.

3        THE COURT:  Okay.  Do what you need to do.

4        MR. GREENBERG:  Okay.

5        THE COURT:  You've got your summaries?

6        MR. LANDMAN:  And, Your Honor, in 2013 it's 70,000.

7  In 2014, it's 55,000.  In 2015, it's 79,000.  That's not just

8  cash and unidentified.  That's specifically cash, deposits

9  identified as cash.

10       THE COURT:  Did you say going back to 2014?

11       MR. LANDMAN:  2013.

12       THE COURT:  2013.

13       MR. LANDMAN:  2013.

14       THE COURT:  He's got his own account going back to

15  2013.  He has his own account during this three-year period

16  when Ms. Cortes' account sees these deposits.  That's what

17  you're saying.

18       MR. LANDMAN:  Yes, with the exception of 2016 where we

19  don't have complete information about whether he had a bank

20  account.

21       THE COURT:  All right.  Brief recess.

22       Please join me, Ms. Chapman.

23    (Recess.)

24       THE CLERK:  20 CR 35, U.S.A. versus Wilmer Alexander

25  Garcia Meza, detention.

1    THE COURT:  Okay.  Everybody is back, and we're back
2   on the record.

3        So I don't know that I need more at this point.  I
4   have a situation where pretrial services did not even recommend
5   a third-party custodianship, and I insisted upon one.  The
6   third-party custodian is someone who is a member of law
7   enforcement as a TSA agent and has gone through a background
8   check.

9        Some serious questions were raised here with regard to
10  these cash deposits and other issues, and yet no evidence
11  really was presented or could be presented today to further
12  support what is a circumstantial potential inference of
13  knowledge or involvement in some type of offense conduct.

14       There's some evidence in the other direction -- and
15  this is concerning, too -- that Mr. Garcia Meza was making
16  money in some capacity and may have needed to use her account,
17  although he apparently had his own account into which he also
18  deposited some substantial amounts of money.  Those amounts of
19  money seem not consistent with what pretrial was told here,
20  that he worked through temporary agencies at a series of jobs.
21  I'm familiar with those types of jobs and that world, and the
22  amounts of money that were talked about here today seem
23  excessive for that type of work.  On the other hand, the
24  defendant is accused of a number of offenses that involve
25  obtaining tax refunds he wasn't entitled to.

1    So with all of that, you know, if we look at the

2   third-party custodian, I'm not prepared to conduct a further

3   investigation of the third-party custodian's involvement.  I

4   don't think that's the Court's role.  I don't think it's

5   pretrial services' role.  The third-party custodian's role in

6   ensuring the defendant's appearance really was a secondary

7   condition that I'm insisting upon initially with pretrial

8   services not recommending it at all.  The other thing pretrial

9   services didn't recommend was supervision.  I'm insisting on

10   that.  The other thing that pretrial services didn't recommend

11   was putting up property.  I'm insisting on that.

12    So I have developed -- well, I'm presented with a set

13   of release conditions, and in order for me to order the

14   defendant detained pending his trial under the Bail Reform Act

15   I have to be persuaded by a preponderance of evidence that this

16   set of conditions will not reasonably assure his appearance.

17    I've got a lot of concerns based on what the

18   Government proffered.  I've got a lot of concerns, but I don't

19   think given the set of conditions that will be imposed here, I

20   don't think the Government has met its burden of persuading me

21   by a preponderance that no set of conditions will reasonably

22   assure his appearance given the additional ones we're

23   fashioning here.

24    So that's where I'm winding up.  So I'm not going to

25   call Ms. Cortes up here and cross-examine her under oath about

1  whatever.  We're not doing that.  We're going to enter a
2  release order.  I need counsel to prepare it.  I need it to
3  address the putting up of the property.  I need it to address
4  the need for additional due diligence and paperwork to be
5  submitted as to the actual estimated value of that property.
6  Today's order will state an amount of $130,000 for the bond
7  partially secured by real property.  That's what today's order
8  will read, but as you all know the Court needs that additional
9  submission of what it really is worth.

10         I don't think I have anything to add at this point.
11 I'd need to see a release order which I'm assuming you'll need
12 time to put together if you haven't already.

13         MR. GREENBERG:  And then you need to admonish him
14 after you get the order.

15         THE COURT:  Correct.  I need to see the order, and
16 then we'll have to do that portion of the proceeding.

17         MR. GREENBERG:  Thank you.

18         THE COURT:  What makes sense in terms of when we can
19 do that?

20         MR. LANDMAN:  In terms of preparing the release order
21 document, I think that's something that can be done today.  The
22 only thing the Government would request, I think at the prior
23 hearing you mentioned electronic monitoring.

24         THE COURT:  Okay.

25         MR. LANDMAN:  The case of Lechuga that I believe the

1   Court is relying on imposed very strict conditions, including

2   home incarceration.  So the Court would just request

3   electronic -- I'm sorry.  The Government would just request

4   electronic monitoring and limiting the defendant's movement at

5   a minimum within the Northern District of Illinois.

6   THE COURT:  I think that's reasonable with the

7   understanding that if the employment that Mr. Garcia Meza may

8   obtain or may maintain calls for some flexibility in that

9   regard counsel can come back and consult with the Government.

10  The Government can be heard, and the Court can consider whether

11  to give pretrial services some discretion and flexibility with

12  regard to the location monitoring.  We did that in a case just

13  this morning.

14  So I'm inclined to go along with what you're

15  suggesting in terms of additional conditions.  As you can see,

16  I'm erring on the side of a more restrictive set of conditions

17  because you proffered some serious concerns.  In order for me

18  to find that you didn't meet your burden, the conditions have

19  to be very extensive.  For all the reasons we even stated the

20  last time, the defendant's status as an unauthorized person in

21  the United States remains a concern, even though he has a very

22  substantial set of ties here in this country and in this

23  community.

24  So I find that you just didn't meet your burden by a

25  preponderance in this case as valiantly as you tried.  So

1  that's where we are.

2  MR. GREENBERG:  Your Honor, given that the paperwork

3  has to be done and there is a status before Judge Bucklo

4  tomorrow morning, I know counsel comes in from out of town and

5  I'm here all the time.  So whatever works in their schedule, I

6  don't know if you need to further admonish Ms. Cortes.  She

7  took today off of work.  She's supposed to work tomorrow.

8  THE COURT:  Well, I appreciate her coming here.  I

9  don't think I need to further admonish her, but the one

10  question I have in mind, well, there is one question.  With

11  third-party custodians, I like to have the release order done,

12  I like to have all the conditions set forth in there, and I

13  like to know that the third-party custodian has reviewed that

14  order and understands all those conditions because that's what

15  we're binding her to as well.  So, yes, I think we probably do

16  need her back to do that.  Do you want to do it tomorrow?  Is

17  that agreeable to you?

18  MR. GREENBERG:  Can we do it at some point this

19  afternoon?

20  THE COURT:  If you're ready, I can make time for you

21  this afternoon.

22  MR. GREENBERG:  It's up to -- I don't prepare the

23  paperwork.

24  MR. LANDMAN:  My understanding from Ms. Cuadra --

25  THE COURT:  One moment.

1        (Discussion off the record.)

2        THE COURT:  So, you know, I'm tied up from 1:30

3   through the rest of the day.  Okay?  But if it's a question of

4   going through the release order terms, I could do it during a

5   lunch break from that conference but I would really need

6   everybody to be prompt about that.  We're always at the mercy

7   of everyone else's schedules, so what time do you want to come

8   back?  I don't want you to come back and have it not done and

9   then we're waiting.

10        (Discussion off the record.)

11        MR. LANDMAN:  Ms. Cuadra said she could get it done

12   within an hour, so anytime after that.

13        THE COURT:  Okay.  The conference starts at 1:30.  Do

14   you think you can come back here at 1:15?

15        MS. CUADRA:  Yes.

16        THE COURT:  Okay.

17        MR. LANDMAN:  I defer to Ms. Cuadra.

18        THE COURT:  I'm sorry, sir?

19        MR. LANDMAN:  I defer to Ms. Cuadra.

20        MR. GREENBERG:  I have a change of plea, but I will

21   have my associate here.

22        THE COURT:  Okay, just have him or her be here.

23        All right.  So 1:30 is okay with the Government,

24   Ms. Cuadra?

25        MS. CUADRA:  Yes.

1          THE COURT:  1:15, 1:15.

2          MS. CUADRA:  1:15, yes.

3          THE COURT:  Come back at 1:15.  Okay?

4          MS. CUADRA:  Okay.

5          MR. GREENBERG:  Do you want Mr. Meza back here, Judge?

6          THE COURT:  Yes, he does need to be back here.  It

7  looks like the marshals can bring him back, so okay.  We'll see

8  everyone at 1:15, though we may not see you.

9          MR. GREENBERG:  Thank you, Your Honor.

10          THE COURT:  All right.

11          MR. LANDMAN:  Thank you, Your Honor.

12          THE COURT:  Okay.

13       (Luncheon recess.)

14

15

16

17

18

19

20

21

22

23

24

25

<pre>
 1                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                             EASTERN DIVISION

 3

 4   UNITED STATES OF AMERICA,          )  No. 20 CR 35-1
                                        )
 5              vs.                      )  Chicago, Illinois
                                        )
 6   WILMER ALEXANDER GARCIA MEZA,      )
                                        )  February 6, 2020
 7              Defendant.               )  1:36 p.m.

 8                         TRANSCRIPT OF PROCEEDINGS
 9      BEFORE THE HON. GABRIEL A. FUENTES, MAGISTRATE JUDGE

10
     APPEARANCES:
11
     For the Government:     MR. MICHAEL C. LANDMAN
12                           MR. THOMAS W. FLYNN
                             United States Department of Justice,
13                           Tax Division,
                             610 D Street,
14                           Washington, DC   20579

15   For the Defendant:      MR. NICHOLAS BURRIS
                             Steven A. Greenberg & Associates, Ltd.,
16                           53 West Jackson Boulevard, Suite 1260,
                             Chicago, Illinois   60604
17

18

19

20

21

22

23                          PATRICK J. MULLEN
                           Official Court Reporter
24                     United States District Court
                   219 South Dearborn Street, Room 1412
25                      Chicago, Illinois   60604
                            (312) 435-5565
</pre>

1          THE CLERK:  20 CR 35, U.S.A. versus Wilmer Alexander
2    Garcia Meza.
3          THE COURT:  Okay.
4          THE CLERK:  I'm sorry.  I apologize.  Continued
5    detention hearing.
6          THE COURT:  Okay.  So let's introduce ourselves for
7    the record just because we have new counsel here for the
8    defendant.
9          MR. BURRIS:  Yes, Judge.  For Mr. Garcia Meza, Nick
10   Burris, B-u-r-r-i-s.  I'm an associate with Mr. Greenberg's
11   firm.
12         THE COURT:  Okay.
13         MR. LANDMAN:  And Michael Landman for the United
14   States.
15         MS. CHAPMAN:  Tom Flynn.
16         THE COURT:  Okay.  Welcome, everybody.  One moment.
17       (Discussion off the record.)
18         THE COURT:  Okay.  So what we've been doing is
19   fashioning a set of release conditions and a release order that
20   can result in the defendant's release today on conditions based
21   on the finding I made that the Government had not met its
22   burden as to showing by a preponderance of the evidence that no
23   set of conditions or no condition will reasonably assure the
24   defendant's appearance in court.  The Bail Reform Act would
25   require me to make that finding in order to detain the

1  defendant.  I can't make that finding, so I can't detain him.
2  I must release him.

3          I'll just add a little bit of record to what the
4  finding is based upon.  It's also based on the fact that while
5  the Court was troubled about the facts the Government proffered
6  today concerning the third-party custodian, Ms. Cortes, on
7  careful reflection that proffer really amounted to no more than
8  a basis for suspicion.  It may be a well-founded suspicion, but
9  it's suspicion rather than evidence of the defendant's
10  involvement with the third-party custodian in the offense
11  conduct.  So that's one reason why I didn't think the
12  Government met its burden.

13          So we talked a little bit about what the conditions
14  would be.  I've been tendered a release order.  I've conferred
15  further with pretrial services, and it did occur to me, well, a
16  couple things.  First of all, pretrial services strongly
17  recommended against the home monitoring, the location
18  monitoring and the home detention condition.  They strongly
19  recommended against that.  I'm already cognizant of the fact
20  that I'm imposing conditions over and above what pretrial
21  services recommended.  I thought further about that condition,
22  and I reviewed the act again.  I reviewed section 3142(c):

23          "Release on conditions.  If the judicial officer
24  determines that the release described in subsection (b) of this
25  section will not reasonably assure the appearance of the person

1   or safety of the community" -- well, here we're dealing with

2   the appearance of the person.

3         So (b) is "release on a personal recognizance or

4   unsecured appearance bond."  So we're in (c) territory.  It

5   provides:

6         "The judicial officer shall order the release of the

7   person under subparagraph (b) of subsection (c) subject to the

8   least restrictive further condition or combination of

9   conditions that such judicial officer determines will

10   reasonably assure the appearance of the person as required."

11         So I thought some more about your request, Government,

12   and part of the input was that the home detention and location

13   monitoring is recommended more commonly by pretrial services

14   when there's a community safety issue at play as opposed to an

15   appearance issue at play.  Here we're really dealing only with

16   the risk of non-appearance, and I am bound to impose the least

17   restrictive further conditions.  So I concluded that those

18   additional conditions that you proposed, while casting no

19   aspersions on your proposal, I couldn't go along with those

20   given the other conditions I'm already entering.

21         So what we're going to do is we're going to go through

22   the release order, but I am going to alter it to exclude the

23   home monitoring.  It looks like it already is.  So paragraph

24   (p) for home detention and location restriction programs is not

25   checked.  So this may be a conversation you already had and

1  I've just been speaking into dead air, but tell me.

2  MR. LANDMAN:  No, Your Honor.  This is a modification

3  we made in anticipation of giving the Court the opportunity to

4  make that finding without having to cross anything out, but the

5  Government would like to just briefly be heard --

6  THE COURT:  Go ahead.

7  MR. LANDMAN:  -- regarding the decision to withdraw

8  that condition.

9  THE COURT:  Go ahead.

10  MR. LANDMAN:  The three cases that the Government has

11  found regarding similar circumstances of a person who is

12  unlawfully in this country with ties to a foreign nation and

13  who's charged with serious offenses had three results.  One,

14  United States versus Merino, M-e-r-n -- M-e-r-i-n-o, out of the

15  Northern District of Indiana ordered detention.  United States

16  versus Lechuga out of this district, which Your Honor has

17  referenced, ordered home confinement.  United States versus

18  Chavez-Rivas out of the Eastern District of Wisconsin ordered

19  electronic monitoring.  All, like Your Honor, noted that these

20  circumstances, being unlawfully present here with ties to a

21  foreign country -- and I won't repeat myself -- require strict

22  conditions.

23  It's the Government's position that the third party

24  secured bond is wholly insufficient.  The Government has no

25  confidence that that will be sufficient incentive for the

1  defendant to remain in this country, in this district, and we'd
2  just ask Your Honor, if there's reasons why electronic
3  monitoring is not appropriate, the Government would ask for
4  reporting to pretrial.

5       Namely, the concern is that if the defendant were to
6  flee, the Government and the marshals wouldn't be aware of his
7  flight for weeks, if not months, after the flight occurred.
8  Being up here in the Chicago area, the ability to know whether
9  someone took their ankle bracelet off or left the district
10 within hours would make it easier in the Government's view for
11 the marshals to track down and be aware of his attempted flight
12 out of the country.

13      THE COURT:  I hear you.  My concern, though, is I'm
14 not sure your concern, which I'm not denigrating, is really
15 within the statute because the statute is conditions required
16 to reasonably assure his appearance.  It's not really
17 conditions that may be required to make it easier to detect his
18 flight, to make it easier to rearrest him if he flees.  So I
19 hear you, but I'm not sure.  I don't know if you want to
20 address that.

21      MR. LANDMAN:  Yes.

22      THE COURT:  I don't think that's really what the
23 statute is meant to do.

24      MR. LANDMAN:  Your Honor makes a good point, but the
25 knowledge of the defendant that these conditions would make it

1  harder for him to flee, the knowledge that he has an ankle

2  bracelet that he would need to cut off, the knowledge that he

3  needs to check in with pretrial once a week and if he doesn't

4  we'll give him further restraint, and knowing that if he was

5  going to flee, you know, he would have to take certain steps

6  over and above just kind of disappearing one day and knowing

7  that the Government won't even know that he's disappeared for

8  weeks, if not months.

9        THE COURT:  Well, pretrial services didn't even

10 recommend supervision here, and I'm imposing it because I do

11 think that's necessary as part of the package that overcomes

12 your effort to make your -- to meet your burden.

13       So frequently judges in this building, magistrate

14 judges, order pretrial supervision.  It's usually as directed.

15 It's usually more or less placed in the discretion of pretrial

16 services as to how much supervision and when to call and when

17 to require the defendant to call in.  I don't think magistrate

18 judges generally micromanage that.

19       I think there's always a possibility that a defendant

20 will not appear.  The statute requires conditions that

21 reasonably assure it, so my concern is I'm not hearing enough

22 from you to warrant my injection of myself into pretrial

23 services work because the courts here in this building

24 generally place a great deal of worth in pretrial services

25 recommendations and in their skill and ability to supervise to

1  help ensure against flight, or I think also to help keep in
2  contact with the defendant so if there is flight that we know
3  about it.
4           Failing to respond to a pretrial services phone call
5  or inquiry is potentially a violation that the Court would hear
6  about.  So I hear what you're saying, but I'm not persuaded
7  that what I'm doing in terms of giving them discretion over
8  their ability to supervise a releasee isn't going to be enough.
9           MR. LANDMAN:  I would just inquire of pretrial on
10 their proposed plan of how often they would contact Mr. Garcia.
11          THE COURT:  I think that's reasonable.
12          Ms. Chapman, what do you say?
13          MS. CUADRA:  So typically, once he is released,
14 (inaudible) request that he call and set up an appointment to
15 meet with us in person once he is back out in the community.
16 We do a post-release assessment to determine how often to see
17 him, so I don't know how often we would see him right now.
18 Typically, it would be quarterly for someone that is
19 (inaudible) with foreign ties.  We'd see him quarterly in
20 person, and he would report electronically or telephonically
21 once a month.
22          THE COURT:  I think part of -- I think they want it
23 weekly, but I think part of it on these is that it's not just
24 someone with foreign ties.  It's someone who technically is not
25 authorized to be here, and the element of risk of a voluntary

1   self-deportation or a voluntary flight rather than to accept

2   the consequences of the federal prosecution only to potentially

3   be deported, let's just go now.  We talked about that at the

4   initial detention hearing.

5       So why would you treat him the same, if you're saying

6   you are, as someone who simply has foreign ties?  Isn't that

7   simply a little --

8       MS. CUADRA:  With a third-party custodian, that also

9   allows for more supervision as well.  So we would rely on the

10  third-party custodian also keeping an eye on the defendant.

11      THE COURT:  So that's a good point.  Here the

12  Government doesn't really have faith in the third-party

13  custodian.  I realize that, but the Court is not agreeing with

14  the Government about that point.  The Government is determining

15  that the set of conditions as fashioned, including the

16  third-party custodian and pretrial supervision and the secured

17  bond and the other conditions in the proposed order are going

18  to be enough.

19      So I hear what you're saying, but I'm not going to go

20  make an order that specifies how pretrial services should

21  exercise its discretion.  I don't know of precedent for that.

22  Let me ask you a quick question.  Lechuga, what was the

23  defendant accused of in that case?

24      MR. LANDMAN:  I believe it was a non-violent drug

25  offense, knowingly possessing 500 grams or more of cocaine with

1    intent to distribute.

2            THE COURT:  So five to 40 with a maximum of at least

3    ten.  500 grams of cocaine?

4            MR. LANDMAN:  Correct.

5            THE COURT:  That's under 841.  That's five to 40

6    years, right?

7            MR. LANDMAN:  I defer to Your Honor.

8            THE COURT:  Yes.

9            MR. LANDMAN:  I'm a tax prosecutor.

10           THE COURT:  I can look it up, but I'm pretty sure

11   that's what it is.

12           MR. LANDMAN:  Yeah.

13           THE COURT:  So that made it an (f)(1) case.

14           MR. LANDMAN:  It did.

15           THE COURT:  A presumption case.

16           MR. LANDMAN:  It did.

17           THE COURT:  All right.  This is not that kind of case.

18           What about Chavez-Rivas?  What was he charged with in

19   that case?

20           MR. LANDMAN:  Illegal reentry after deportation.

21           THE COURT:  Okay, not quite an (f)(1) offense but one

22   that's very heavily focused on the person's foreign

23   nationality, very heavily focused on getting punished simply

24   for coming back and then getting sent back.

25           So I think those two cases where EM was used, I can

1   see them being distinguishable from this case, which is an

2   identity theft, mail fraud, and false tax return case.  I know

3   we talked about the minimums and the maximums, and I think it

4   was a 24-month minimum possibly consecutive to other counts,

5   right?

6               MR. FLYNN:  It is consecutive to other counts.

7               THE COURT:  Okay.  You've made a good point, but I

8   think given all the circumstances, including the nature of the

9   offense, I don't think the additional condition is warranted

10  given what I'm hearing from pretrial services and given what we

11  heard just now for the manner in which they plan to exercise

12  their supervision.

13              So anything else you want to be heard on?

14              MR. LANDMAN:  No, I won't belabor the point.

15              THE COURT:  Okay.  So what we have to do now is go

16  over these conditions.  Okay?

17              I'm going to now, Mr. Garcia Meza, read to you the

18  conditions that you're going to be subjected to here, and I'm

19  going to ask you if you understand them.  If for any reason you

20  don't, you need to tell me that.  I'm not going to put you

21  under oath to do this, but obviously if there's a violation of

22  any of the conditions, there certainly won't be an ability by

23  anybody to say:  I didn't understand them, or I didn't know or

24  they were never told to me.

25              Okay?  Let's start with the first one.  You must not

1   violate any federal, state, or local law while under release.
2   Do you understand that?
3            THE DEFENDANT:  Yes.
4            THE COURT:  Do you understand that means any law at
5   all, really, all the way from something we find in the Federal
6   Criminal Code that would be a felony to some jaywalking or some
7   ordinance violation?  It's any law at all that you can't
8   violate.  Do you understand that?
9            THE DEFENDANT: Yes, sir.
10           THE COURT:  And it also could include the use of
11  marijuana which remains a violation of federal law.  Do you
12  understand that?
13           THE DEFENDANT: Yes, sir.
14           THE COURT:  Okay.  Defendant must cooperate in the
15  collection of a DNA sample if it's authorized by 42 U.S.C.
16  14135(a).  You can talk some more with your counsel about what
17  exactly that statute is, but basically it means if you're
18  required or authorized to provide this DNA sample, you have to
19  cooperate in its collection.  Do you understand that?
20           THE DEFENDANT:  Yes.
21           THE COURT:  You have to advise the Court or the
22  pretrial services office or supervising officer in writing
23  before making any change of residence or telephone number.  Do
24  you understand that?
25           THE DEFENDANT:  Yes.

1       THE COURT:  So that means moving or changing phone
2   numbers.  They have to be able to find you, and before you make
3   such a change you have to tell them in writing.  You've got
4   that, right?
5       THE DEFENDANT:  Yes.
6       THE COURT:  Okay.  You have to appear in court as
7   required.  If you're convicted, if you're convicted, you have
8   to surrender as directed to serve a sentence that the court may
9   impose.  Do you understand that?
10      THE DEFENDANT:  Yes.
11      THE COURT:  Do you understand that you must sign an
12  appearance bond in this case?
13      THE DEFENDANT:  Yes.
14      THE COURT:  All right.  Where's my appearance bond?
15  Here it is.  I'm holding a copy of the appearance bond.  It's
16  got a signature about halfway down the page.  Is that your
17  signature?
18      THE DEFENDANT:  Yes.
19      THE COURT:  Do you understand that the appearance bond
20  is in the amount of $130,000?
21      THE DEFENDANT:  Yes.
22      THE COURT:  And do you understand that it is partially
23  secured by real property at 1419 Muirfield in Waukegan?
24      THE DEFENDANT:  Yes.
25      THE COURT:  Okay.  All right, additional conditions of

1   release.  You're placed in the custody of Daisy Cortes of 1419

2   Muirfield at 1419 Muirfield in Waukegan, and she needs to

3   supervise you, make every effort to ensure your appearance at

4   all proceedings, and notify the court immediately if you

5   violate any condition or if you're no longer in her custody.

6   You understand that, right?

7            THE DEFENDANT:  Yes.

8            THE COURT:  You must submit to supervision by and

9   report to the pretrial services department.  The release order

10  has a phone number, and it's as directed.  Do you understand

11  that?

12           THE DEFENDANT:  Yes.

13           THE COURT:  So if they tell you to report, if they

14  tell you to call them, if they tell you to meet with them, you

15  have to comply, right?

16           THE DEFENDANT:  Yes.

17           THE COURT:  Okay.  You have to surrender any passport

18  to pretrial services.

19           Does the defendant have a passport?  Has he

20  surrendered one?  What's going on?

21           MR. BURRIS:  Judge, Mr. Greenberg has the passport.

22  I'm unsure whether he -- I don't believe he tendered it to the

23  Court or anything like that yet.

24           THE COURT:  All right.  Well, you're going to

25  communicate to him that that's what this order provides, so he

1    or you has to provide that passport to Ms. Chapman.

2    Understood?

3         MR. BURRIS:  Understood, Judge.  No problem.  We have

4    it in the building today, and we'll do that.

5         THE COURT:  Do it today.

6         You have to abide by the following restrictions.

7    Well, you understand that condition, don't you, Mr. Garcia

8    Meza?

9         THE DEFENDANT:  Yes.

10        THE COURT:  Okay.  You have to abide by the

11   restrictions on personal travel or association, and that is

12   travel being restricted to the Northern District of Illinois.

13   It's about the northern third of the state, and you can consult

14   with your counsel to look at a map that will show you what that

15   is.  Once being provided to you, you can't go outside of those

16   boundaries.  Do you understand that?

17        THE DEFENDANT:  Yes.

18        THE COURT:  You have to not possess a firearm,

19   destructive device, or other weapon.  Do you understand that?

20        THE DEFENDANT:  Yes.

21        THE COURT:  There's something else I want you to

22   understand about that.  When we say "not possess," what do we

23   mean?  We mean it's not on your person.  It's not accessible to

24   you in your house.  It's not in your custody or your control.

25   Your control could include if there's a firearm that you put up

1  with someone else so that if you ever wanted it you could get

2  it from that person; or a hiding place somewhere that you have

3  access to, that's also possession.  You're not going to do any

4  of those things, are you?

5          THE DEFENDANT:  No.

6          THE COURT:  You understand that condition?

7          THE DEFENDANT:  Yes.

8          THE COURT:  Okay.  Another condition is you must

9  report as soon as possible to the pretrial services office or

10  supervising officer every contact with law enforcement

11  personnel, including arrests, questioning, or traffic steps.

12  Do you understand that?

13          THE DEFENDANT:  Yes.

14          THE COURT:  You understand that arrests, questioning,

15  or traffic stops mean literally any contact at all, right?

16          THE DEFENDANT:  Yes.

17          THE COURT:  Do you understand that you're not going to

18  be the one figuring out how important the contact is?  If

19  there's any contact at all, you're going to report it to them.

20          THE DEFENDANT:  Yes.

21          THE COURT:  That can mean they come to the house if

22  there's a party at the house and they question you and a bunch

23  of other people but they don't make an arrest.  You've still

24  got to report that.

25          THE DEFENDANT:  Right.

1    THE COURT:  If you get a ticket for jaywalking, you've
2  got to report it.  Do you understand?
3    THE DEFENDANT:  Yes.
4    THE COURT:  Okay.  Finally what I think we need to do
5  is just make sure that this is your signature on the release
6  order that I'm pointing to with my index finger.  Is it?
7    THE DEFENDANT:  Yes.
8    THE COURT:  Okay.  Then I need to have a brief
9  colloquy with Ms. Cortes.
10    Ms. Cortes, can you come up, please?
11    (Brief pause.)
12    THE COURT:  I'm going to put you under oath again.
13  That's okay with you?
14    MS. CORTES:  Yes.
15    THE COURT:  You did fine the last time.
16    THE CLERK:  Please raise your right hand.
17    (Witness duly sworn.)
18    THE COURT:  Okay.  Ms. Cortes, were you here in the
19  courtroom when I went through the order setting conditions of
20  release and discussed it with the defendant?
21    MS. CORTES:  Yes.
22    THE COURT:  And was there anything about any of those
23  conditions that you don't understand?
24    MS. CORTES:  No.
25    THE COURT:  Did you fully understand your obligations

1     as a third-party custodian?

2            MS. CORTES: Yes.

3            THE COURT: Okay. I now want to talk about the

4     appearance bond. So the appearance bond is a secured bond of

5     $130,000, and it is partially secured by the real property at

6     1419 Muirfield. That's your house, right?

7            MS. CORTES: Yes.

8            THE COURT: You own that house outright, right?

9            MS. CORTES: Yes.

10            THE COURT: And there's not a mortgage on the house.

11            MS. CORTES: No.

12            THE COURT: And there's some amount of equity in it.

13     We're not exactly sure how much, but there's some amount of

14     equity. It might be 100, might be 120, something in that

15     range?

16            MS. CORTES: Correct.

17            THE COURT: Am I right to your knowledge?

18            MS. CORTES: Yes.

19            THE COURT: Okay. I want to make sure you understand

20     something; that is, if the bond is revoked and if the bond is

21     forfeited and if the Government were to then wish to cause you

22     to forfeit that security, to give up your interest in that

23     house in full, that could happen. That's a consequence of a

24     bail violation in this case. Do you understand that?

25            MS. CORTES: I do.

1         THE COURT: It would be very sad if something like

2 that happened, but it would be worse if it happened and you

3 didn't understand that that was a consequence. It underscores

4 the reasons why we're releasing the defendant into your

5 custody. You're going to make sure he shows up and doesn't run

6 because you're on the hook with this house.

7         MS. CORTES: That's correct.

8         THE COURT: Do you understand that?

9         MS. CORTES: Yes.

10         THE COURT: Okay. Then I think that's all I need from

11 you, Ms. Cortes.

12         Let me just ask pretrial. I always do this. Is there

13 anything else pretrial services thinks the Court should inquire

14 of the third-party custodian?

15         MS. CUADRA: No, sir.

16         THE COURT: Okay. Thank you, ma'am.

17         MS. CORTES: Thank you.

18         THE COURT: All right. So that will be our order

19 today. I'm going to go ahead and sign the bond and the release

20 order. Counsel, stick around so that you get your copies.

21         MR. LANDMAN: Yes, Your Honor.

22         THE COURT: So the other thing that's important is we

23 are going to need what is referred to sometimes as the post

24 paperwork for the house. So this is referenced in the

25 appearance bond. A current appraisal must be provided to the

1  Government by February 24th of 2020.  So I'd like to have a

2  status at 11:00 a.m. on February 25th of 2020 to see where that

3  is.  Okay?

4          MR. BURRIS:  No problem.

5          THE COURT:  At that status, the defendant is required

6  to be here.  The third-party custodian needs to get him here

7  and needs to be here.  So we understand that.  Okay?

8          MS. CORTES:  Okay.

9          THE COURT:  Question from the Government?

10          MR. LANDMAN:  Yes.  It was our understanding that if

11  the appraisal is successfully received by the Government

12  before, we can move to dismiss the hearing.

13          THE COURT:  And you don't have the appraisal yet?

14          MR. LANDMAN:  No, no, once we receive it.  If we

15  receive the appraisal prior to the 25th, we could notify the

16  Court and it would obviate the need for a continued status

17  conference.

18          THE COURT:  One moment.  I think that's right.

19      (Discussion off the record.)

20          THE COURT:  Yeah, that's correct.  I'm sorry.

21      (Discussion off the record.)

22          THE COURT:  Yes, we would strike that status, if

23  necessary.

24          MR. LANDMAN:  Okay.

25          THE COURT:  So it may be stricken.  But if it's not

1    stricken, you have to be here, Mr. Defendant.  Understood?

2              THE DEFENDANT:  Yes, sir.

3              THE COURT:  Okay.  Then that's all I have unless

4    counsel has anything else.

5              MR. BURRIS:  I have one question.

6              THE COURT:  Yes.

7              MR. BURRIS:  I just want to be clear that I'm getting

8    it to the right location.  You want me to give it to the

9    Government.

10             THE COURT:  I want you to do what?

11             MR. BURRIS:  Once it's ordered to be done by us --

12   well, it's been ordered, the appraisal.  So once we have it, we

13   get a copy to the Government and to pretrial?

14             THE COURT:  Hold on.  I want to make sure to answer

15   your question correctly.

16             MR. BURRIS:  I appreciate that.

17       (Discussion off the record.)

18             THE COURT:  Okay.  So by the evening on the 21st --

19   the 24th, I'm sorry.  You have to bring it to the clerk's

20   office on the 20th floor of this building.

21             Is there a particular individual?

22             THE CLERK:  No, they just go to the intake desk and

23   they follow the procedures.

24             THE COURT:  They'll help you on 20.  Okay?

25             MR. BURRIS:  I can certainly make it work from there.

1          THE COURT:  They'll tell you where to go.  Make sure
2    that gets done.  Okay?
3          MR. BURRIS:  I appreciate it.
4          THE COURT:  Okay.  Then we're done.
5          Counsel has another question.  Go ahead.
6          MS. CUADRA:  It's my understanding that the clerk's
7    office, they don't need a copy of the appraisal at all.  They
8    just need a copy of the forfeiture agreement and the original
9    quit claim deed.  But if we review the appraisal and we're fine
10   with it, then that would be it.
11         THE COURT:  Can I have your name again?
12         MS. CUADRA:  Dorothy.  You may know me as Dorothy
13   Flores from a long time ago.
14         THE COURT:  That's probably right.
15         MS. CUADRA:  Yeah.
16         THE COURT:  And I don't remember your last name.
17         MS. CUADRA:  It's Cuadra, Dorothy Cuadra.
18         THE COURT:  Cuadra, okay.
19         So here's the answer to your question, counsel.  You
20   are to consult with Ms. Cuadra and follow her instructions as
21   to the posting of that bond by providing the necessary
22   documentation to the U.S. Attorney's office and to the clerk's
23   office as necessary.
24         Good enough?
25         MS. CUADRA:  Yes.

1          THE COURT:  Talk to her and get it right.  Okay?

2          MR. BURRIS:  Perfect.  Thank you.

3          THE COURT:  All right.  Thanks a lot.

4          MR. LANDMAN:  Thank you.

5          MR. BURRIS:  Thank you.

6          MR. LANDMAN:  Have a good day, Judge.

7          THE COURT:  Don't forget to stick around for your

8     copies.

9          MR. BURRIS:  Absolutely.

10          MR. LANDMAN:  Thank you.

11        (Proceedings concluded.)

12                     C E R T I F I C A T E

13          I, Patrick J. Mullen, do hereby certify the foregoing
      is an accurate transcript produced from an audio recording of
14    the proceedings had in the above-entitled case before the
      Honorable GABRIEL A. FUENTES, one of the magistrate judges of
15    said court, at Chicago, Illinois, on February 6, 2020.

16                          /s/ Patrick J. Mullen
                            Official Court Reporter
17                          United States District Court
                            Northern District of Illinois
18                          Eastern Division

19

20

21

22

23

24

25